NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: December 23, 2025

S24Y1247, S24Y1248, S24Y1249, S24Y1250, S24Y1251, S24Y1252. IN THE MATTER OF CHRISTOPHER CASEY TAYLOR (six cases).

PER CURIAM.

These six matters are before the Court on the report and recommendation of the State Disciplinary Review Board ("Review Board"), which reviewed special master LaVonda Rochelle DeWitt's report and recommendation. In each of these six matters, Christopher Casey Taylor (State Bar No. 699696), a member of the Bar since 2002, is charged with violating several provisions of the Georgia Rules of Professional Conduct ("GRPC") regarding clients of the law firm where he is a partner. Taylor's law practice, and that of his firm, has a heavy focus on immigration matters. Indeed, all six of these disciplinary matters arise out of representation in the context of immigration law. The special master recommended a six-

to-twelve-month suspension with a condition on reinstatement, while the Review Board instead recommended disbarment based largely on its conclusion that Taylor's lack of remorse should weigh heavily against him. Taylor initially denied that he was culpable for any misconduct regarding the grievants' cases. But he now concedes the record supports a determination that he violated the Rules concerning supervision of other attorneys, and he asks this Court to impose a suspension consistent with the special master's recommendation of discipline. However, with the benefit of oral argument[1] and having carefully reviewed the record, we conclude that disbarment is warranted.

## 1. Special Master's Report and Recommendation

### (a) Factual Findings

Following an extensive fact-finding process, which involved multiple evidentiary hearings and the parties' submission of documentary and testimonial evidence, the special master made the

---

[1] These matters were orally argued before this Court on September 16, 2025.

following findings of fact: Taylor is one of two equity partners at the firm, which has an immigration-focused practice, and he characterizes himself as the "face of the firm." New clients reviewed their firm engagement agreement with a paralegal and did not speak to an attorney about their case until the firm was paid. Taylor generally did not attend court proceedings with clients, but he commonly filed an entry of appearance as counsel for the firm's clients. During the relevant periods, Taylor had approximately 10,000 open cases and consistently filed pleadings in the immigration courts under his name as counsel of record.

Taylor made conflicting representations regarding his degree of oversight of associate attorneys and staff, but evidence established that these individuals were at times permitted to sign Taylor's name to letters and filings related to client matters without Taylor having reviewed those documents before submission. Taylor alternatively claimed both that he did not have supervisory or administrative duties within the firm and that he was a "supervising attorney" who had "supervisory responsibility" over the firm's other

attorneys and staff. He entered an appearance in five of the six immigration cases at issue, received court documents addressed to him as counsel of record in those five cases, and in the sixth case referred to himself as "lead counsel" and acknowledged that he reviewed interrogatory responses. The special master found that, despite Taylor's assertions to the contrary, Taylor was each of these clients' attorney and owed them duties under the GRPC.

The special master next considered certain policies and procedures of the immigration courts based on a policy manual published by the federal Executive Office for Immigration Review ("EOIR"), of which Taylor acknowledged being aware. The EOIR manual provides that when a client retains more than one attorney at a time, all such attorneys are counsel of record and are all responsible as counsel for the client, although only one is recognized as the primary or "notice" attorney. Only individual attorneys, not firms, may represent parties before the immigration courts. And if a firm wishes to re-assign responsibility for a client from one attorney to another, a substitution of counsel must be filed, with the original

4

attorney remaining responsible for the representation until substitution is granted.[2] Immigration courts also require parties to submit documents supporting certain applications, like those supporting a removal cancellation application, no later than 15 days before the hearing on the matter. Taylor acknowledged awareness of the 15-day timing requirement, the attorney substitution requirement, and the fact that his firm did not follow the latter.

The special master then addressed what she described as Taylor's "indifference and disregard" towards the disciplinary process. Taylor initially did not cooperate with the discovery process, forcing the Bar to file two motions to compel before he provided discovery responses. Taylor and his counsel also failed to cooperate in advancing these matters, necessitating several calls with the special master on issues as basic as case timelines and Taylor's non-

---

[2] Although immigration courts may define the processes and procedures by which an attorney must conduct themselves in that court, Georgia law (not federal law), as regulated by the State Bar and this Court, defines the practice of law within the state, including the duties that an attorney owes to a client. See *Eckles v. Atlanta Technology Group*, 267 Ga. 801, 804 (1997) ("Only this Court has the inherent power to govern the practice of law in Georgia.").

compliance with the discovery process. The special master entered a scheduling order in April 2023, setting the evidentiary hearing for September 19–21, 2023, with the understanding that all parties and witnesses would appear in person. But on September 19, Taylor's counsel appeared without Taylor, who failed to provide prior notice to the Bar or the special master that he would not appear. Taylor instead asked, through counsel, to appear virtually based on a confidential medical situation. The special master ended the proceedings, privately reviewed medical records that Taylor submitted later that day, and entered an order the following morning authorizing Taylor to appear virtually.[3] Taylor appeared virtually on the second day of the hearing, but his failure to appear the day before necessitated adding another day to complete the proceedings. After the Bar rested, Taylor left the hearing, stating that he was ill. He did not ask for a continuance or present any evidence or testimony, leaving such matters to his counsel. Taylor

---

[3] The special master issued the order on the morning of the second day scheduled for the hearing, before Taylor filed a written request to appear virtually. He filed his motion several days later to complete the record.

6

then submitted briefs and a proposed order to the special master, seeking to have all the complaints against him dismissed, but the special master explained that post-hearing procedures did not permit her to rule on the proposed order. Taylor then submitted a one-and-a-half page proposed report and recommendation providing that no discipline be imposed because: Taylor did not do the work at issue; because he did not manage or supervise other attorneys; because his firm did not mishandle the grievants' cases; because the grievants' negative outcomes were foreseeable; and because his firm's administrative issues did not amount to ethical violations.

The special master then analyzed the underlying grievances and found as follows. The client in State Disciplinary Board Docket ("SDBD") No. 7481 (S24Y1247), who was born in Mexico and entered the United States in 1999, retained Taylor's firm in April 2012 regarding his removal proceeding. The client paid $4,000 in fees, executed his engagement agreement with the assistance of a paralegal, and never met Taylor during the firm's representation. Taylor entered an appearance in the case as the primary attorney

7

and filed on the client's behalf an EOIR 42B Application for Cancellation of Removal and Adjustment of Status—which bore Taylor's signature as the client's attorney and the preparer of the application—and an I-485 Application to Adjust to Permanent Resident Status. G.D., a "self-supervising" attorney employed by the firm, filed an entry of appearance in the case and filed documents supporting the removal cancellation application. Taylor did not attend the client's "master hearing" or speak to G.D. about the case. Around four years later, in 2016, Taylor submitted a request for prosecutorial discretion (which asks immigration officials to exercise their discretion not to pursue removal), signing the document as the client's attorney. But Taylor did not follow up or obtain a decision on the request. In November 2018, Taylor again filed an entry of appearance as the client's primary attorney and submitted documents in the removal cancellation case for the first time since December 2012. Taylor did not appear for a December 2018 hearing, with the client instead represented by C.S., another attorney at Taylor's firm. After the hearing, the immigration judge denied the

client's application for cancellation of removal and ordered him removed. Taylor entered an appearance and filed an appeal on the client's behalf, but did not consult with the client, obtain his authorization, or execute a new engagement agreement. The client subsequently terminated Taylor's representation and retained a new attorney.

In SDBD No. 7483 (S24Y1248), a client retained Taylor's firm to represent him in a removal proceeding in 2012. Taylor did not meet with the client, discuss his case with him, or appear at his hearings. In February 2014, G.D. attended the client's master hearing and filed an application for cancellation of removal on the client's behalf. Taylor signed the application as the attorney who had prepared the filing, but he did not prepare or review the application or meet with the client before or after the hearing. At the master hearing, an immigration judge scheduled the client's "individual hearing" for July 2016 and informed the client that any documents on which he wished to rely had to be filed no later than 15 days before the individual hearing. Taylor was aware that the 15-

9

day deadline was the standard practice in immigration courts. The client provided the supporting documents, at G.D.'s request, in May 2016. The individual hearing was rescheduled to March 8, 2018, and K.M., an attorney at Taylor's firm, attended the hearing. The same day, a motion bearing Taylor's signature and seeking the untimely filing of the client's documents was filed with the court. The motion alleged that those documents were not provided to Taylor until February 28, 2018, although the client had in fact provided them in 2016. The immigration judge denied the motion and asked K.M. why the documents had not been timely provided. K.M. responded that the firm had delayed asking the client to bring in the documents. The immigration judge then denied the application for cancellation of removal, and Taylor failed to consult with the client or K.M. regarding how the case should proceed. Taylor instead filed an appeal and entry of appearance without the client's consent, arguing that the immigration judge had failed to consider the evidence put forward at the hearing. The Board of Immigration Appeals ("BIA")

then affirmed the immigration judge's decision. Taylor failed to communicate the outcome of the appeal to the client.

In SDBD No. 7484 (S24Y1249), an individual entered the United States from Mexico in 1992 at the age of two, and immigration officials detained her in 2011. Her sister paid $4,000 to retain Taylor's firm to assist the client in obtaining legal status. One of the firm's employees told the client that Taylor would be her attorney. During the disciplinary proceedings, Taylor acknowledged that the client was his client but also stated that she was a client of the firm, asserting that whether he represented her was a "complex" question without a simple answer. Taylor was listed as counsel of record for the client and conceded that he had "some level of responsibility" for the client's representation although he never met or spoke with her. In January 2012, Taylor filed a removal cancellation application on the client's behalf, but no one from the firm explained the requirements of such a filing to the client. A week before her individual hearing, the client met with an unnamed female attorney from the firm to prepare for the hearing. The client

11

testified that the attorney was not prepared for the hearing and knew nothing about the client's case. The client's application was denied after the hearing, but no one from the firm explained the decision to the client. Without obtaining the client's consent or discussing the merits of her case with her, Taylor filed an appeal and entry of appearance on her behalf. He did not personally fill out or supervise the preparation of the notice of appeal, which had a section requiring the client to state in detail the reasons for the appeal. Taylor also failed to file a brief. The BIA dismissed the appeal because the submitted documents failed to "meaningfully apprise [the] Board of the reasons underlying the appeal." Taylor failed to discuss the outcome of the appeal with the client.

In SDBD No. 7632 (S24Y1250), a native of Nicaragua entered the United States in 2017 and paid Taylor's firm $5,500 to represent her in connection with an application for asylum based on abuse she suffered from her father. Taylor entered an appearance in the client's case and appeared at her master hearing, but neither Taylor nor any other firm attorney spoke with her before the hearing.

Taylor filed an application for asylum without preparing or reviewing it and without consulting the client about the application or her chances of success. In the disciplinary proceedings, Taylor said the application was filed simply to delay the client's removal, but this strategy was apparently never communicated to the client. Although Taylor submitted certain documents in support of the client's application, he did not submit other documents that she had provided to him and did not present witness testimony in support of her claim. R.H., an attorney at Taylor's firm, represented the client at her March 2020 individual hearing, but Taylor did not meet with R.H. or the client before the hearing or inquire about why certain documents were not submitted. The client's application was denied, and while R.H. told the client he would represent her on appeal and the client paid the requested filing fee to the firm, no appeal was filed. When the client contacted the firm to inquire about the appeal, R.H. and another employee falsely told her that the appeal had been filed. Taylor maintained that the appeal was not filed because the client did not execute a new engagement agreement or pay

additional attorney fees. There was no evidence that she was asked to do either; the evidence presented in other related matters showed that the firm filed appeals without a new engagement agreement or additional fees. Taylor did not communicate with the client outside of the master hearing or consult about her case with the attorneys who worked on it, whom Taylor failed to supervise. Taylor also did not refund any of the fees the client paid. She subsequently retained new counsel and spent more than $10,000 in additional fees for her immigration case.

In SDBD No. 7633 (S24Y1251), a native of Mexico who entered the United States in 2000 hired Taylor's firm while incarcerated. The client first paid the firm $3,000 for Taylor to secure a bond for him and later paid $4,500 for Taylor to file a removal cancellation application. Taylor did not meet or speak with the client or consult about the case with the attorneys who actually worked on it. Taylor entered an appearance as the client's primary attorney and filed the removal cancellation application without preparing or reviewing it. The client provided the firm with documents related to his claim

before his individual hearing; Taylor failed to supplement the application before the hearing. C.N., an attorney at Taylor's firm, represented the client at the hearing, but Taylor did not speak with C.N. about the case beforehand. C.N. informed the court at the hearing that he intended to update the client's application. The court asked why an incomplete application had been submitted, and C.N. answered that he had not prepared the application. The court paused the proceedings so that Taylor could appear and "take ownership" for the incomplete filing but ultimately resumed the hearing, denied the client's application, and ordered his removal. C.N. then informed the client that the client could initiate an appeal. The client said he would pursue an appeal but indicated that he intended to hire new counsel. The client did not authorize Taylor or his firm to file an appeal and instead terminated the representation and asked for a copy of his file. Taylor nonetheless filed a notice of appeal as the client's attorney, but he failed to file a brief or statement in support of the appeal, resulting in the appeal's dismissal. Taylor was aware that failure to file a brief or statement

could result in dismissal, and he indicated on the notice of appeal that a brief or statement would be filed. The client learned of the failed appeal only after someone from the firm told him about it. He subsequently spent an additional $5,000 to obtain new counsel. Taylor did not refund any of the fees paid by the client.

In SDBD No. 7634 (S24Y1252), a client hired Taylor's firm in 2019 to assist him in obtaining permanent U.S. residency. The client met with Taylor, who told him that Taylor could assist him in gaining permanent residency. The client paid $2,000 and provided information such as his home address. Taylor provided no legal services to the client: he failed to respond to inquiries from the client on the status of the matter, failed to make an entry of appearance, failed to file a notice of substitution of counsel, failed to notify the immigration court of his representation, and failed to provide the client's address to the court. In March 2020, the client received a letter bearing Taylor's signature, informing him that his case had been scheduled for a master hearing. Taylor did not actually sign or review the letter or otherwise attempt to communicate with the

16

client. Approximately two weeks before the scheduled hearing, the client called Taylor's firm for information regarding the hearing. He was unable to reach Taylor or any other attorney. The client appeared for the hearing, but neither Taylor nor anyone from his firm was present. The clerk then informed the client that a deportation order had already been entered against him for failure to appear at the hearing, which had been rescheduled to a date several months earlier. No one from the firm informed the client of the date change until approximately two weeks later when the client received a letter, signed by Taylor, which noted the missed court date and the entry of the removal order. Taylor did not refund any of the fee paid by the client, who had to hire a new attorney.

**(b) Rules Violations**

The special master then turned to Taylor's alleged violations of the following GRPC provisions: Rules 1.1,[4] 1.2(a),[5] 1.3,[6] 1.4(a),[7] 1.16(d),[8] 3.2,[9] and 5.1(a) and (b).[10] The maximum sanction for a

---

[4] Rule 1.1 imposes on lawyers a duty to provide competent representation.

[5] Rule 1.2(a) provides, in pertinent part, that "a lawyer shall abide by a client's decisions concerning the scope and objectives of representation and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued."

[6] Rule 1.3 provides that "[a] lawyer shall act with reasonable diligence and promptness in representing a client. Reasonable diligence as used in this rule means that a lawyer shall not without just cause to the detriment of the client in effect willfully abandon or willfully disregard a legal matter entrusted to the lawyer."

[7] Rule 1.4(a) provides, in pertinent part, that a lawyer shall "reasonably consult with the client about the means by which the client's objectives are to be accomplished; … keep the client reasonably informed about the status of the matter; … [and] promptly comply with reasonable requests for information[.]"

[8] Rule 1.16(d) provides that

[u]pon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned.

[9] Rule 3.2 provides that "[a] lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client."

[10] Rule 5.1(a) provides, in pertinent part, that "[a] law firm partner … shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the Georgia Rules of Professional Conduct[,]" while Rule 5.1(b) provides that "[a] lawyer having direct supervisory authority over another lawyer shall make reasonable

18

single violation of Rules 1.1, 1.2(a), 1.3, and 5.1(a) and (b) is disbarment; the maximum sanction for a single violation of Rules 1.4(a), 1.16(d), and 3.2 is a public reprimand.

Addressing Taylor's violations of the GRPC rule-by-rule, the special master concluded that Taylor violated Rule 1.1 in the 7484 matter by failing to properly specify the grounds for appeal in his submission of the notice of appeal to the BIA.

Taylor violated Rule 1.2(a):

- in the 7481 matter by failing to consult with the client regarding the filing of an appeal and by filing an appeal without that client's authorization;

- in the 7483 matter by failing to consult with the client about how to proceed with his case once his application was denied and by failing to consult with that client before filing an appeal on his behalf;

---

efforts to ensure that the other lawyer conforms to the Georgia Rules of Professional Conduct."

19

- in the 7484 matter by failing to discuss any aspect of the case with the client, including failing to discuss with her the requirements for success on her application, failing to explain the denial of her application, and failing to consult with her regarding the filing of an appeal;

- in the 7632 matter by failing to consult with the client regarding the merits of her case and by failing to pursue her desired appeal;

- in the 7633 matter by failing to consult with the client regarding the documents to support his claim, failing to consult with him regarding the filing of an appeal, and filing that appeal without authorization; and

- in the 7634 matter by failing to consult with or provide legal services to the client.

Taylor violated Rule 1.3:

- in the 7481 matter by failing to submit any documents supporting the client's application between 2012 and 2018;

- in the 7483 matter by failing to timely submit documents supporting the client's case—resulting in those documents not being considered by the immigration judge—and by misrepresenting when that client had provided those documents;

- in the 7484 matter by failing to diligently pursue a properly supported appeal;

- in the 7632 matter by failing to present documents and witness testimony in support of the client's asylum claim and by failing to ensure that her appeal was filed;

- in the 7633 matter by submitting an incomplete application, failing to timely update that application, and failing to submit a brief or statement in support of the client's appeal, resulting in its dismissal; and

- in the 7634 matter by failing to notify the court of his representation of the client, failing to inform that client of the change in the hearing date, and failing to appear for court.

Taylor violated Rule 1.4(a):

- in the 7481 matter by failing to communicate with the client about his case and appeal;

- in the 7483 matter by failing to communicate with the client about his case, including the motion for out-of-time filing, the outcome of the individual hearing, and the appeal;

- in the 7484 matter by failing to discuss the application or appeal with the client;

- in the 7632 matter by failing to communicate with the client about her case, including failure to discuss documents submitted in support of her claim and her appeal;

- in the 7633 matter by failing to communicate with the client about his case, including failure to discuss the documents needed to support his claim and appeal; and

- in the 7634 matter by failing to have any communications with the client beyond the initial consultation.

Taylor violated Rule 1.16(d) in the 7634 matter by abandoning the client without having done any work on his case and by failing to refund any of the $2,000 fee the client paid.

Taylor violated Rule 3.2 in the 7632 matter by failing to make reasonable efforts to pursue the client's appeal, despite having prepared the documents necessary to do so.

As to Rule 5.1(a) and (b), the special master first determined that Taylor failed to make reasonable efforts to ensure that his firm had policies and procedures to reasonably ensure that the firm's attorneys would comply with the GRPC. The special master also determined that Taylor's failure to supervise attorneys and his policy of allowing attorneys to sign his name to pleadings without reviewing those documents contributed to the pattern of non-compliance with the GRPC. And the special master concluded that Taylor violated Rule 5.1 in the 7632 matter by failing to select or review the documents submitted by the client, failing to discuss with R.H. (the attorney who appeared at the client's hearing) why certain documents were omitted, and failing to ensure that R.H. pursued

23

that client's appeal. And the special master concluded that Taylor violated Rule 5.1 in the 7633 matter by failing to ensure that a complete application was submitted on the client's behalf, failing to discuss that client's case with C.N. (the attorney who appeared at the client's hearing) or ensure that C.N. updated the application, and failing to ensure that the firm complied with the client's desire to terminate the firm's representation.

### (c) ABA Standards

Citing the American Bar Association Standards for Imposing Lawyer Sanctions ("ABA Standards"), see *In the Matter of Morse*, 265 Ga. 353, 354 (1995) (to determine the appropriate level of discipline, disciplinary authority considers the duty violated; the lawyer's mental state; the potential or actual resulting injury; and aggravating or mitigating factors), the special master first determined that Taylor failed to meet his obligations to consult with and diligently represent these clients. The special master deemed his actions—including neglecting these clients and failing to supervise other firm attorneys—to be knowing rather than

24

inadvertent or negligent. Regarding the harm caused, Taylor's clients were vulnerable victims and suffered significant injuries in the form of adverse outcomes in their immigration cases. And, citing ABA Standard 4.42, the special master noted that suspension is generally appropriate when an attorney's knowing failure to perform services for a client causes injury or potential injury and when an attorney's pattern of neglect causes injury or potential injury to a client. In aggravation, the special master found that Taylor engaged in a pattern of misconduct, committed multiple offenses, engaged in bad-faith obstruction of the disciplinary process by intentionally failing to comply with the rules and orders of the disciplinary authority, refused to acknowledge the wrongful nature of his conduct, harmed vulnerable victims, and had substantial experience in the practice of law. See ABA Standard 9.22(c), (d), (e), (g), (h), and (i). Taylor's lack of prior discipline was the only mitigating factor. See ABA Standard 9.32(a). The special master concluded that a six-to-twelve-month suspension was the

appropriate sanction.[11] The special master further concluded that Taylor's reinstatement should be conditioned on "completing an evaluation with the Law Practice Management Department of the State Bar and providing the Office of the General Counsel with proof that [Taylor] has implemented the recommendations of the Law Practice Management Department in his law firm practice."

## 2. Review Board Proceedings

### (a) Taylor's Exceptions to the Special Master's Report & Recommendation

Taylor began his exceptions to the special master's report and recommendation by asserting that his role as the firm's "notice attorney" did not imply a corresponding duty for him to represent

---

[11] The special master based that conclusion on *In the Matter of Lewis*, 313 Ga. 695 (2022) (six-month suspension for lawyer who violated Rules 1.1, 1.2, 1.3, 1.4, 1.16(d), and 3.2 in three separate matters); *In the Matter of Golub*, 313 Ga. 686 (2022) (one-year suspension with conditions for lawyer who violated Rules 1.2(a), 1.3, 1.4(a), 1.16(d), 3.2, and 8.4(a)(4) in the representation of one client); *In the Matter of Sneed*, 314 Ga. 506 (2022) (nine-month suspension with conditions for lawyer who violated Rules 1.3, 1.4, and 9.3 in four separate matters); *In the Matter of Kirby*, 312 Ga. 341 (2021) (six-month suspension for lawyer who violated Rules 1.2, 1.3, 1.4, and 1.16 in four separate matters); and *In the Matter of Miller*, 291 Ga. 30 (2012) (twelve-month suspension with conditions for lawyer who violated Rules 1.2, 1.3, and 1.4 in the representation of one client).

each client individually. Taylor argued that the "notice attorney" procedure, which he describes as routine in immigration cases, arises from the fact that immigration cases can take many years to resolve: designating one senior attorney for this role helps ensure the firm continues to receive notice on such matters, even if the attorneys directly responsible for the case should leave the firm. Taylor argued that the record demonstrates that his designation as the "notice attorney" should not be taken as proof of his individual involvement in each client's case as most of the clients at issue here had not met Taylor, had no expectation that he would be individually involved in their cases, and instead worked only with associates and staff. Taylor then argued that the record shows he did not personally represent any of these clients and that, to the extent the Bar was proceeding under a respondeat superior theory of liability, its failure to charge violations of Rule 5.1 in four of these six matters was fatal to the allegations in those matters. Next, Taylor argued that new counsel initiated at least four of the six grievances for Taylor's former clients because of what he

27

characterized as their attorneys' willful misinterpretation of *Matter of Lozada*, 19 I.&N. Dec. 637 (Bd. of Immigr. Appeals 1988), a BIA decision that some practitioners interpret to require a bar complaint to be filed against a client's former attorney in order to sustain a motion to re-open removal proceedings.

Taylor then turned to the specific client grievances. As to each of the six, Taylor made largely the same argument that he did not individually represent any of the clients. Taylor asserted that each client's engagement agreement did not list Taylor as the primary attorney assigned to the case; that it was clear that other attorneys and staff would be responsible for actually providing the agreed-upon services; that he had little or no interaction with the clients, such that they had no reasonable expectation that Taylor would provide the legal services they sought; and that various clients gave false testimony or made false statements during the grievance process. Concerning the 7481, 7484, and 7632 matters, Taylor alleged that the disciplinary process was being manipulated by the clients' new attorneys, whom he characterized as competitors who

had brought spurious grievances against him as to matters for which he had no direct involvement or responsibility. Taylor also addressed the purported merits of each client's underlying legal matters, arguing that the clients' underlying claims and cases lacked merit or that the clients' own actions were the "proximate cause" of their unfavorable outcomes.

**(b) The State Bar's Response**

In response, the Bar first argued that Taylor was not simply a "notice attorney" for the clients' underlying cases: he entered appearances as counsel of record in each case; his name was listed on all pleadings as counsel of record; the records of the immigration courts listed him as counsel of record; and no substitution of counsel was filed in any of the cases. And the Bar noted that, notwithstanding his inconsistent assertions to the contrary, Taylor testified that he had "supervisory responsibility" over lawyers and staff at the firm after a senior associate left and that Taylor performed "tasks" in the case underlying at least one of these matters. The Bar also argued that Taylor was the clients' attorney

of record—and thus was directly responsible for the misconduct that occurred—in all of these matters even though he was not charged with violating the supervision Rules in each matter. Finally, the Bar argued that Taylor's claim about the reasons these grievances were filed in the first place was misdirected because, regardless of what may have prompted the grievances, the Bar was prosecuting these matters at the State Disciplinary Board's direction and only after the Office of the General Counsel's extensive investigation.

The Bar then addressed each matter individually and maintained that Taylor directly represented each of the clients, relying principally on his entries of appearance and the presence of his name on the clients' filings. And the Bar insisted that, even if other attorneys also worked on the underlying cases, Taylor was at least *an* attorney for each client and had direct ethical obligations to them all. Regarding Taylor's arguments about the merits of the clients' underlying immigration cases, the Bar noted that the disciplinary process is designed to assess whether an attorney has failed in his ethical obligations under the GRPC—not to adjudicate

the potential merits of a client's underlying claims. Even in a case unlikely to prevail on the merits, the Bar said, an attorney must fulfill duties like communicating and consulting with the client, providing diligent representation, and ensuring that other attorneys under his supervision comply with their ethical responsibilities. The Bar also noted that, although Taylor made much of the supposed lack of merit of the clients' cases, there is no evidence that he or anyone else at his firm advised the clients of these apparent defects. Moreover, the Bar argued, Taylor's attempt to shift blame onto the clients for the unfavorable results in their cases did not address Taylor's own failings.

**(c) Review Board's Report and Recommendation**

The Review Board then issued its report and recommendation. As to the special master's findings of fact, reviewed for clear error, the Review Board characterized the primary factual dispute as whether Taylor represented the clients in an individual capacity. Although the Review Board acknowledged Taylor's extensive arguments to the contrary, it concluded that Taylor had not

demonstrated that the special master's findings—that Taylor bore responsibility for the representation of each of these clients—were clearly erroneous. The Review Board then adopted and incorporated the special master's factual findings. The Review Board also adopted and incorporated the special master's conclusions of law, including her application of the ABA Standards to the duties violated, Taylor's mental state, the potential or actual injury caused by his misconduct, and the aggravating and mitigating factors. The Review Board reiterated that Taylor's actions were knowing and that the clients all suffered significant injuries.

But the Review Board rejected the special master's conclusion regarding the appropriate sanction to be imposed. The Review Board first stated (without any citation to authority) its belief that the special master had to recommend a precise sanction rather than a range for suspension (as the special master proposed here). The Review Board cited the special master's reference to *Lewis*, *Sneed*, and *Kirby* and concluded that each of those cases dealt with similar Rule violations but were distinguishable because they arose from

voluntary discipline petitions. See *Lewis*, 313 Ga. at 698; *Sneed*, 314 Ga. at 510; *Kirby*, 312 Ga. at 345. The Review Board further distinguished *Golub* and *Miller*, which the special master also cited, on the basis that Golub expressed remorse for the harm done to his client and Miller engaged with the disciplinary process and was remorseful. *Golub*, 313 Ga. at 694; *Miller*, 291 Ga. at 30. The Review Board stated that the correct standard for determining the appropriate sanction was ABA Standard 4.41,[12] applied in *In the Matter of Bell*, 313 Ga. 615, 615–16, 618 (2022) (disbarment for failure to act diligently and adequately communicate with client; lawyer made numerous misrepresentations to client, exhibited a dishonest or selfish motive, had two instances of prior discipline, and failed to respond to the Bar's motion for summary judgment), and *In the Matter of Roberts*, 314 Ga. 510, 511, 514, 517–18 (2022) (attorney

---

[12] ABA Standard 4.41 provides that

[d]isbarment is generally appropriate when: (a) a lawyer abandons the practice and causes serious or potentially serious injury to a client; or (b) a lawyer knowingly fails to perform services for a client and causes serious or potentially serious injury to a client; or (c) a lawyer engages in a pattern of neglect with respect to client matters and causes serious or potentially serious injury to a client.

33

without prior discipline disbarred for conduct in two client matters where attorney failed to respond to filings and appear at court hearings, failed to communicate and consult with clients to their substantial detriment, and refused to acknowledge wrongful conduct and showed indifference to making restitution). Since Taylor knowingly failed to perform services for multiple clients, constituting a pattern of neglect that seriously injured multiple clients, and since he lacked remorse for his misconduct, the Review Board recommended that Taylor be disbarred.

## 3. Filings Before this Court

### (a) Taylor's Exceptions to the Review Board's Report & Recommendation

Taylor begins his exceptions to the Review Board's report and recommendation by discussing the "rarefied field of immigration law" and lamenting the "state of utter dysfunction" of the immigration courts, "particularly the court here in Atlanta." But Taylor admits to violating Rule 5.1(a) as to the 7632 and 7633

34

matters,[13] and he admits that the record could support finding that he also violated Rule 5.1(b) in those matters, given his managerial authority over his firm's work and his failures to ensure that the attorneys directly handling these matters were adequately supervised. Taylor nonetheless continues to insist that he was only the "marketing face" of the firm and a "notice attorney" for all cases. He expresses his mystification at the failings of the associate attorneys. And he bemoans the fact that the immigration courts' unusual practices made him appear responsible for matters in which he was not actually involved. Yet Taylor concedes that he is "legally, ethically, and personally obligated" to his firm's clients and to ensuring that legal services are competently rendered. Still, he attempts to cabin any failures on his part to a failure to adequately

---

[13] Taylor further notes that, although violations of Rule 5.1(a) were not charged in the remaining four cases, the record could support finding that he violated that Rule in those cases as well.

attend to the firm's structure, which he concedes has become "untenable" as the firm has grown rapidly in size.[14]

Taylor nonetheless excepts to the Review Board's decision on multiple grounds. Taylor admits that the record supports the special master's findings that he failed to supervise associate attorneys and ensure that those attorneys provided the required and requested legal services. But Taylor emphasizes that the special master did not find that he directly and knowingly made false representations to clients, failed to provide legal services, or abandoned client matters. He maintains that the Review Board improperly rejected the special master's recommended suspension in favor of disbarment, which he contends is not appropriate. Taylor argues that *Bell* and *Roberts*, cited by the Review Board, are

---

[14] Taylor says the firm's structure has since been altered by establishing a committee of three senior associates to exercise direct supervisory authority over more junior personnel. And Taylor says the firm would also benefit from additional guidance from the Law Practice Management Department. Taylor further asserts that he is working with his law partner and senior associates to develop additional systems to assist the firm's associates, apparently including the provision of additional support for associates to access professional development resources.

distinguishable because they addressed intentional misconduct and personal harm to clients rather than supervisory inaction. As to the Review Board's focus on his lack of remorse, Taylor insists that he was merely putting up a good-faith defense to the charges against him.[15]

Taylor next reiterates his claim that the grievances underlying these matters largely or entirely resulted from competitor attorneys' weaponization of *Lozada*. Taylor insists that *Lozada*'s effects are a "specter … haunt[ing]" all attorneys who practice removal defense. And he insists that the aggrieved clients' cases were destined to fail, so any ethical violations on his part were not the proximate cause of any harm to the clients, let alone sufficient to support the finding of serious injury necessary to warrant disbarment. Taylor asserts that the special master properly analyzed the level of injury that the

---

[15] Taylor also maintains that he did not intentionally fail to comply with the rules or orders governing the disciplinary proceedings, given the serious medical issues he was experiencing at the time of the hearing on these matters. He has not disclosed what those medical issues were, but the special master granted Taylor's motion to appear virtually after confidentially reviewing medical records Taylor submitted.

clients suffered and properly applied ABA Standard 4.42 in concluding that suspension was appropriate.

Finally, Taylor argues that the alleged violations of Rules 1.1, 1.2(a), 1.3, 1.4, 1.5(a), 1.16(d), and 3.2 cannot be sustained because the Bar failed to allege a violation of Rule 5.1(c).[16] Taylor asserts that, even assuming his firm's associate attorneys committed the misconduct alleged, Taylor could not be held vicariously liable unless the Bar alleged and proved that he violated Rule 5.1(c). Consistent with the special master's recommendation, Taylor asks this Court to impose a suspension between six and twelve months, with reinstatement conditioned on completing an evaluation with the Bar's Law Practice Management Program and providing to the

---

[16] Rule 5.1(c) provides that

[a] lawyer shall be responsible for another lawyer's violation of the Georgia Rules of Professional Conduct if: (1) the lawyer orders or, with knowledge of the specific conduct, ratifies the conduct involved; or (2) the lawyer is a partner or has comparable managerial authority in the law firm in which the other lawyer practices or has direct supervisory authority over the other lawyer, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

Bar's Office of the General Counsel proof that he has implemented any recommendations from that evaluation.

**(b) The Bar's Response**

In response, the Bar first notes that it supports the imposition of a six-to-twelve-month suspension but maintains that the Review Board correctly concluded that disbarment would also be appropriate. In support of disbarment, the Bar argues that the special master's findings that Taylor individually represented each of the grievants—making him responsible for the misconduct that occurred in each matter—belies Taylor's assertion that he violated only the Rules governing supervisory misconduct. And the Bar rejects Taylor's contention that disbarment would be excessive, relying on ABA Standard 4.41's provision that disbarment is the presumptive sanction for knowing failure to perform legal services or a pattern of neglect that causes serious or potentially serious injury to a client. The Bar asserts that Taylor's firm's business model was predicated on knowing neglect, citing his acknowledgement that growth in the firm's client list made it

impossible to adequately manage all client matters within the firm's existing structures. And, the Bar says, the special master's findings also support concluding that Taylor knowingly failed to perform needed services for his clients and that the clients thereby suffered serious injuries. The Bar also contends that the special master's findings regarding harm to the clients are sufficient to support disbarment, particularly given that cases in other jurisdictions[17] have concluded that the risk of deportation constitutes a "serious injury" warranting disbarment. And the Bar argues that the special master properly found six aggravating factors and only one mitigating factor—Taylor's lack of prior discipline.

The Bar disputes Taylor's argument that these disciplinary proceedings were instituted only because *Lozada* arguably requires aggrieved litigants to file a Bar complaint against former counsel in order to reopen removal proceedings. The Bar asserts that its decision to pursue these matters arises only from Taylor's

---

[17] Specifically, the Bar points to *Matter of Anschell*, 69 P3d 844, 855 (Wash. 2003) (en banc), and *People v. Wake*, 528 P3d 943 (Colo. 2023) ("substantial injury").

misconduct, not anything related to immigration law. Regarding Taylor's argument that any errors in the 7632 matter do not warrant discipline because the client's case was meritless, the Bar argues that nothing in the record suggests Taylor communicated with the client regarding the merits of her case. The Bar further responds that disciplinary proceedings are not concerned with the merits of underlying legal claims; that Taylor had ethical obligations even to clients with a low chance of success; and that failure to meet those obligations harmed Taylor's clients regardless of the merits of their cases. Finally, contrary to Taylor's argument that he could not be found to have violated certain Rules because the Bar failed to allege a violation of Rule 5.1(c), the Bar maintains that Taylor overlooks the special master's conclusion that he was the attorney of record in these clients' cases, thereby owed them direct ethical obligations under the GRPC, and is responsible for the misconduct at issue.

**4. Analysis**

As noted, Taylor now concedes that he violated Rule 5.1(a) in the 7632 and 7633 matters, that the record could support finding

41

that he violated Rule 5.1(b) in those matters as well, and that the record could support finding that he violated Rule 5.1(a) in the four matters in which it was not charged.[18] Additionally, the special master made a specific factual finding that the record supported the conclusion that Taylor was the attorney of record in these clients' cases. Taylor has not demonstrated that this finding was clearly erroneous or that, given this finding, the special master erred in concluding that Taylor's conduct violated Rules 1.1, 1.2(a), 1.3, 1.4(a), 1.16(d), and 3.2, as charged.[19]

Regarding the proper sanction, we first note that Taylor's failures of diligence, competence, communication, and supervision

---

[18] The Bar helpfully explained at oral argument that Rule 5.1 violations were not charged in the other matters because Taylor's systemic failures to supervise did not become clear until Taylor testified later in the disciplinary process. See *In re Ruffalo*, 390 US 544, 551–52 (1968) ("The charge must be known before the proceedings commence. They become a trap when, after they are underway, the charges are amended on the basis of testimony of the accused.").

[19] Neither the special master's findings regarding Taylor's failures of communication, nor our review of those findings, should be understood to suggest that when multiple attorneys represent a client, each attorney must directly communicate with the client. But *some* attorney must communicate with the client.

violate some of an attorney's most consequential duties. See ABA Standard 3.0(a) (duty violated impacts sanction determination). Taylor abandoned the grievants and did not ensure that other attorneys would provide the diligent, competent representation those clients were entitled to. And, per the special master's unrebutted finding, that abandonment and abdication of supervisory responsibility was knowing—with "conscious awareness of the nature or attendant circumstances of the conduct[.]" *Knowledge*, ABA Standards. See also ABA Standard 3.0(b) (mental state informs sanction determination).

Further, Taylor's misconduct caused at least some of his clients actual injury. See ABA Standard 3.0(c) (degree of actual or potential injury, ranging from "little or no" injury to "serious" injury, informs sanction determination). At least three clients received no refund for the several thousand dollars in fees they each paid Taylor's firm. And at least four clients had to obtain new representation—one spending $10,000 to retain new counsel and another spending $5,000—on top of having to effectively restart litigating their cases.

43

See, e.g., *In the Matter of McCalep*, 318 Ga. 260, 269 (2024) (attorney injured grievants "due to the loss of funds they paid for services he did not provide, and the loss of their opportunities to hire competent and diligent lawyers to pursue their claims and defend their rights"). We regularly conclude that this sort of misconduct—abandoning even a single client after taking their money—is injurious. See, e.g., *In the Matter of Haklin*, 321 Ga. 530, 531–32 (2025) (disbarring attorney who injured single client by accepting $2,300 fee and abandoning that client); id. at 532 (collecting cases disbarring attorneys who similarly injured and abandoned a single client and violated Rules 1.2, 1.3, and 1.4, along with aggravating factors like client vulnerability and attorney's substantial professional experience).[20] So Taylor abandoned his clients, did so knowingly, and injured at least some of them in the process. The presumptive sanction is—at minimum—suspension. See ABA Standard 4.42

---

[20] Abandonment can itself be an injury when, for example, an adjudicative body makes some decision adverse to the client because of his attorney's abandonment. See, e.g., *In the Matter of Blain*, 315 Ga. 475, 476 (2023) (disbarring attorney based on part on abandonment of client, which resulted in court dismissing client's case with prejudice).

44

(suspension generally appropriate when attorney knowingly fails to perform services for client or engages in pattern of negligence and that misconduct causes "injury" or "potential injury").

But that does not end the matter. Multiple aggravating factors, see ABA Standard 3.0(d), demonstrate that disbarment is warranted. The vulnerable nature of the victims of Taylor's misconduct and the systemic nature of that misconduct are particularly aggravating. Regarding the victims' vulnerability, Taylor continues to assert that he is effectively the victim of competitor attorneys' unscrupulous use of *Lozada* through the grievances brought on behalf of his former clients. But that assertion appears entirely speculative and, as noted below, is largely beside the point. And it cannot be ignored that Taylor's former clients appear to be legally unsophisticated parties whose uncertain immigration statuses rendered them particularly vulnerable and potentially less likely than other parties to pursue redress of attorney misfeasance through the State Bar grievance process. See, e.g., *In the Matter of Strang*, 322 Ga. 354, 358–59 (2025) (client's

incarceration and indigency, among other things, aggravated misconduct and supported disbarment).

As to the pattern of Taylor's misconduct and his commission of multiple offenses, the record makes clear that ill-advised practices endemic to Taylor's firm fostered his failures of diligence, communication, and supervision in these matters.[21] During the periods in question, Taylor led a practice of signing up large numbers of clients to be serviced by a firm with a modest number of attorneys, and he then exercised minimal, if any, oversight of how those clients' cases were handled. Taylor now concedes that, given the firm's rapid growth, the practices initially in place are now insufficient. Taylor's failure to attend to these matters—and his seeming indifference to the actual handling of client matters once the client paid the firm—exacerbate the severity of his misconduct. See, e.g., *In the Matter of Chin*, 322 Ga. 218, 231–33 (2025) (systematic misconduct in firm management and client fund

---

[21] It is deeply ironic that one of these practices—filing an appeal without consulting the client—occurred in each of the appealed matters *except* for the one matter where the client actually requested an appeal.

46

administration, among other things, aggravated misconduct and supported disbarment). It is not merely Taylor's failure to supervise but his own failures of diligence, consultation, and communication, that justify his disbarment.

We acknowledge that in many cases resulting in disbarment, there is "serious" injury to the attorney's client or clients (often in the form of substantial monetary loss or materially worse case outcomes), one or more Rule 8.4(a)(4)[22] violations, and total failure to engage with the disciplinary process.[23] In those matters,

---

[22] Rule 8.4(a)(4) provides that it shall be a violation of the GRPC for a lawyer to "engage in professional conduct involving dishonesty, fraud, deceit or misrepresentation."

[23] See, e.g., *In the Matter of McGowan*, 322 Ga. 349, 352 (2025) (disbarring attorney who defaulted, abandoned client, violated Rule 8.4(a)(4), improperly retained $30,000 of client's funds, and converted over $17,000 of those funds to personal use, which forced client to "drain[] her savings account to pay her medical expenses"); *In the Matter of David-Vega*, 318 Ga. 600, 605–06 (2024) (disbarring attorney who defaulted, violated Rule 8.4(a)(4), failed to file client's lawsuit before statute of limitations expired); *In the Matter of Tuggle*, 319 Ga. 687, 690, 697–98 (2024) (attorney violated Rule 8.4(a)(4), among others, and abandoned two clients, one of whom spent nearly $32,000 to set aside a default judgment imposed as result of attorney's abandonment); *In the Matter of Van Johnson*, 319 Ga. 627, 627–28, 631–32 (2024) (accepting voluntary surrender of license, tantamount to disbarment, from attorney who, among other things, forged client's signature to convert a $47,000 settlement payment).

disbarment is typically presumed appropriate. See ABA Standards 4.41, 4.51 (disbarment presumptively warranted when failure of diligence or competence causes "serious injury" or "potentially serious injury"). Here, it is unclear whether Taylor's misconduct caused his clients to face worse case outcomes, the State Bar did not charge Taylor with any Rule 8.4(a)(4) violations, and Taylor did not default in the disciplinary proceedings, so this is not the typical disbarment case.

Disbarment is nonetheless appropriate. In the first instance, the special master's findings reflect that at least some of these clients suffered economic injury through the loss of thousands of dollars of unreturned unearned fees and the cost of hiring other representation. Moreover, injury to the client and the severity thereof is only one of several factors for determining the appropriate sanction for attorney misconduct. And we have never conditioned disbarment, much less a finding of injury to the client, on a showing that the client lost their case *because of* their attorney's misconduct. Disbarment can be proper even when a client's case has a low chance

of success from the start. Cf. *In the Matter of Jackson*, 321 Ga. 256, 258 (2025) (disbarring attorney whose abandonment precluded client from filing timely habeas petition); *Strang*, 322 Ga. at 357, 358–59 (noting attorney's arguments about merits of clients' cases but disbarring because attorney knowingly abandoned multiple clients and numerous aggravating factors outweighed absence of prior discipline). See also *In the Matter of Melnick*, 319 Ga. 730, 736 n.10, 739–40 (2024) (attorney's argument—that Rule 1.3 and 1.4 violations did not harm client because she received a favorable outcome with another attorney—"reflect[ed] a lack of remorse"). In fact, disbarment is often warranted based on other harms, like financial harm, especially where (as here) an attorney causes such harm to multiple clients. See, e.g., *In the Matter of Greene*, 320 Ga. 527, 531 n.9 (2024) (noting that attorney's abandonment may or may not have extended one client's period of incarceration but still concluding disbarment was warranted when attorney abandoned three clients, two of whom paid at least $10,000 in legal fees before being abandoned). Likewise, we have never held that finding that

an attorney violated Rule 8.4(a)(4) or defaulted in the disciplinary matter is necessary to support disbarment. See, e.g., *Haklin*, 321 Ga. at 531 (disbarring attorney who abandoned one client and failed to participate in disciplinary process but was not charged with violating Rule 8.4); *In the Matter of Briley-Holmes*, 304 Ga. 199, 208–09 (2018) (accepting voluntary surrender of license when attorney abandoned seven clients and caused serious injury). And while the record supports Taylor's claim that medical issues affected his participation in the special master's hearing, Taylor's overall participation in the disciplinary process was—even if short of default—half-hearted at best and obstructive at worst. See, e.g., *In the Matter of Lain*, 311 Ga. 427, 427–28, 437–38 (2021) (misconduct aggravated by "failure to engage honestly in the disciplinary process" when attorney responded inadequately to State Bar's discovery requests, resulting in multiple motions to compel, with which attorney did not comply). We therefore evaluate this disciplinary matter on the many facts and circumstances particular to this matter and outlined above. *In the Matter of Jones*, 298 Ga.

185, 187 (2015). The unique circumstances here do not change our conclusion that disbarment is appropriate considering the duties violated, the harm caused, and the aggravating factors.

We also acknowledge the lack of adequate comparator cases concerning Taylor's Rule 5.1 violations. See, e.g., *Melnick*, 319 Ga. at 740 (sanctions imposed in prior, similar cases can be useful in establishing a baseline comparison). But for the other violations— Rules 1.1, 1.2(a), 1.3, 1.4(a), 1.16(d), and 3.2—there is no shortage of precedent supporting disbarment for such misconduct. See, e.g., *In the Matter of Lemoine*, 322 Ga. 463, 463–64 (2025) (disbarring attorney for violating Rules 1.1, 1.2(a), 1.3, and 1.4(a), among others); *McCalep*, 318 Ga. at 269–70 (same). We are convinced that Taylor's direct failures of communication, consultation, and diligent and appropriate representation, exacerbated by his failures of supervision, support disbarment.[24] Taylor's Rule 5.1 violations,

---

[24] Given the special master's determination that Taylor was these clients' attorney—and thus owed them direct ethical obligations under the GRPC and was personally responsible for violating them—Taylor's argument regarding the Bar's failure to charge Rule 5.1(c) violations is unavailing. Disbarment is

despite the lack of direct comparator cases, simply bolster that conclusion.

Although we have concluded that disbarment is the appropriate sanction here, we note that our analysis departs from the Review Board's analysis in one notable respect. The Review Board's disbarment recommendation appears to be premised largely on Taylor's lack of remorse for his misconduct. Refusing to acknowledge the wrongful nature of one's conduct is a recognized aggravating factor, and one which certainly applies here: for example, even as late as oral argument on these matters, Taylor was reluctant to acknowledge his responsibility for the violations of Rule 5.1 (violations which he had already conceded in this Court). But we caution Special Masters and the State Disciplinary Review Board against overreading an attorney's refusal to admit guilt from the outset. Attorneys in disciplinary proceedings have the right, like all litigants, to advance good-faith, colorable arguments supporting

---

warranted based on *Taylor's* misconduct towards *his* clients, not because of anyone else's purported ethical violations.

their position. See *In the Matter of Meyers*, 302 Ga. 742, 745 (2017) ("[A] lawyer's decision to put up a defense in a disciplinary proceeding … is not always an aggravating factor that counsels imposition of harsher discipline."). So refusing to admit guilt from the outset generally means the mitigating effect of showing remorse—one factor among many—is absent, not that the aggravating effect of refusing to "acknowledge [the] wrongful nature of [one's] conduct" is present. See ABA Standards 9.22(g), 9.32(l).

Taylor has advanced numerous arguments that attempt to undermine the seriousness of these matters. He has argued, among other things, that his "ethical violations were not the proximate cause of the grievants' removal orders," that the grievants' cases were "always doomed to fail," and that the grievants' new attorneys, alleged competitors of Taylor's firm, filed the State Bar complaints to "hijack the disciplinary process to harass" Taylor. As to the underlying cases' merits, we decline to deem Taylor's culpability lessened based on his conjecture about his clients' chances of success. It would require us to speculate on merits issues based only

on a limited record and Taylor's characterization[25] of those matters. Also, as noted above, Taylor's misconduct clearly caused injury apart from the underlying cases' outcomes. And regardless, the existence and degree of injury is only one factor in determining the proper sanction for attorney misconduct. We agree with the Bar that these proceedings properly focus on Taylor's failure to fulfill his professional obligations, not the underlying cases' merit.

Taylor has also consistently attempted to cast his mishandling of the underlying client matters as resulting primarily from the peculiarities of immigration court practice, especially the practice of limited representation.[26] Because it is unnecessary to resolve this matter, we decline to set out any general guidelines regarding how

---

[25] We need not and do not express any opinion here about the propriety of charging several thousands of dollars to file documents that contain, in the attorney's opinion, no chance of success other than in delay of the proceedings. But we are not willing to accept the premise that an attorney representing a client who lacks meritorious claims is freed of the duties to communicate and otherwise provide professional services.

[26] In his exceptions filed in this Court, Taylor cites a 2022 amendment to the EOIR rules which he says altered immigration-court practice to allow attorneys to enter appearances to provide limited services. But the relevant facts in these matters apparently all occurred *before* the rule's promulgation.

considerations like a firm's size and practice area may bear on the issues that have arisen here. Instead, we reiterate that a disciplinary inquiry in circumstances like these properly focuses on whether a firm has adequately discharged its obligations to its clients. And a firm's structure and management practices do not relieve individual attorneys who have appeared as counsel of record of their responsibility for their clients.

Concerning Taylor's claim that competitor attorneys brought these grievances for improper reasons, we reiterate our admonition that "weaponization of the disciplinary process must not be encouraged." *In the Matter of Cook*, 311 Ga. 206, 215 (2021). But whatever reasons may have prompted the underlying grievances, these matters should stand or fall on their own merits—especially given Taylor's acknowledgement that he violated the lawyer supervision Rules and his failure to rebut the special master's determination that he was responsible for these clients and personally violated Rules 1.1, 1.2(a), 1.3, 1.4(a), 1.16(d), and 3.2. In

short, Taylor's arguments largely miss the point and do not change our conclusion that disbarment is proper.

## 5. Imposition of Discipline

Accordingly, it is hereby ordered that Christopher Casey Taylor be removed from the rolls of persons authorized to practice law in the State of Georgia. Taylor is reminded of his duties under Bar Rule 4-219(b).

*Disbarred. All the Justices concur.*